21-07242MB(JR)

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE CERTAIN ITEMS

I, Chad Lakosky, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property further described in Attachment A, which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 50 U.S.C. § 1705. I am a Special Agent (SA) with the United States Department of Homeland Security Investigations (HSI).  I have been so employed since March 2018.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in, among other things, criminal investigative techniques, and investigations of violations of United States Codes, to include investigations related to immigration and controlled substances offenses.

3.      Prior to my employment with HSI, I was employed by the Pinal County Sheriff's Office in the State of Arizona for 10 years as a Deputy Sheriff.  During that time, I investigated violations of state criminal and civil laws, conducted interviews, conducted covert surveillance, collected evidence, and made arrests for violations of criminal state laws. I was also assigned as a detective to the United States Marshal's Service Violent Offender Task Force. My duties with this assignment included investigations into the whereabouts of state, local, and federal fugitives.  During that assignment, I received training in conducting criminal investigations, covert surveillance, and evidence collection. Prior to that, I was employed as a police officer in the Town of Marana, Arizona, from January 2006-April 2008, where I had similar duties as my employment as a Deputy Sheriff.  I am also a graduate of the Central Arizona Regional Law Officer's Training Academy, where I received training in, among other things, criminal investigative techniques, and investigations of violations of criminal and state statutes.

4.      During my law enforcement career, I have received formal training, as well as on-the-job training, relative to the investigation and interdiction of human smuggling and human trafficking. I have become knowledgeable regarding the trafficking methods employed by alien smugglers to conceal, transport, resupply, and harbor aliens present in the United States without admission or parole.

5.      Throughout my career, I have performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the management of investigations in several investigative program areas to include human and drug smuggling, financial crimes, immigration violations, and crimes involving child exploitation; (b) performing physical surveillance and thereby observing and recording movements of persons suspected of various criminal activities; (c) interviewing witnesses, cooperating individuals and informants; (d) writing affidavits in support of federal search and seizure warrants; and (e) testifying before federal Grand Juries.

6.      Furthermore, based on my background, training, and experience, I know that individuals involved in human smuggling often use cellular telephones to do the following:

a.      Use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating between foot guides, smugglers, facilitators, and other transporters/drivers. They also use cellular telephones to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans.

b.      Use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, photo and video images, and contact lists containing contact information for their criminal associates to accomplish their criminal activities.

c.      Use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

7.      The purpose of this application is to seize evidence from a black Apple iPhone with a clear case (**Target Device #4**), currently located in the custody of Homeland

Security Investigations in Tucson, Arizona. As further described below, **Target Device #4** was seized from the scene of an alien smuggling event on May 28, 2021.

8.     The applied-for warrant would authorize the forensic examination of **Target Device #4** for the purpose of identifying electronically stored data particularly described in Attachment B.

## SOURCES OF INFORMATION

9.     I am familiar with the circumstances described below, both through my personal participation in this investigation and by the discussions I have had with other law enforcement officers who have knowledge of this case.  This affidavit is being submitted for the limited purpose of securing a search warrant; therefore, I have not included every fact known to me or other law enforcement officers concerning this investigation.  I have set forth below only the facts I believe are necessary to establish probable cause for the issuance of a search warrant.

## PROBABLE CAUSE

10.     On May 22, 2021, Tohono O'odham Police Department (TOPD) Officer DeGrazia observed a white four-door 2001 BMW 300i (Arizona license plate WZA9LB) traveling northbound on Federal Route 15 (FR15) from State Route 86 (SR86) that appeared to be speeding. Officer DeGrazia attempted to catch up to the vehicle but could not because the vehicle was traveling at a high rate of speed.  Officer DeGrazia eventually lost sight of the vehicle. Officer DeGrazia and other officers located the vehicle a few moments later near milepost 3 on FR15. It appeared that the driver lost control, and the vehicle rolled multiple times.  TOPD officers located the driver of the vehicle, Matthew Dylan **Ramirez**, still inside the vehicle in the driver's seat secured by his seatbelt. No one else was inside of the vehicle.

11.     TOPD officers and US Border Patrol agents on scene located three men and one woman in the area around the vehicle that had been ejected from the vehicle.  The woman was pronounced dead at the scene. **Ramirez** and the three men were transported to Banner University Medical Center in Tucson, Arizona, for treatment of injuries sustained during the collision.

12.     Agents identified the three other men as Jared De Jesus Vasquez-Ortega,

Adrian Sanchez-Mota, and Jesus Madrid-Varela. An HSI agent later conducted checks of immigration databases for Vasquez-Ortega, Sanchez-Mota, and Madrid-Varela, and found that each had prior immigration arrests and removals from the United States and had been identified during previous arrests as citizens of Mexico. During later interviews, all three men admitted to being Mexican citizens in the United States illegally without permission from the United States. Sanchez-Mota identified Gonzalez-Nunez as his girlfriend and admitted that both had illegally crossed into the United States from Mexico a few days prior to this incident.

13.     Later that same day, TOPD Detective Jose Flores and I interviewed **Ramirez** at the Tohono O'odham Police Department San Xavier substation. After having waived his *Miranda* rights, **Ramirez** stated as follows:

a.     He initially denied smuggling the aliens but eventually admitted that he was being paid $1,000 to transport the aliens to a location just south of the Border Patrol checkpoint on FR15 near North Komellik, Arizona.

b.     Once there, the aliens would walk around the checkpoint to avoid detection by agents, and he would return at a later time when they were ready to be picked up north of the Border Patrol checkpoint.

c.     He was been for the smuggling work via the "Snapchat" social networking application.

d.     His phone was a black Apple iPhone with a clear case, and he used that device to coordinate the smuggling event with someone only identified as a partial Snapchat ID as "Jay."

14.     TOPD officers were unable to locate a black Apple iPhone with a clear case at the crash scene during the initial investigation but did locate 6 other cell phones. **Ramirez** denied ownership of 6 phones seized by TOPD officers that were shown to him during the interview.

15.     On May 27, 2021, Detective Flores and I executed both state and federal search warrants to search **Ramirez's** white BMW 300 4 door sedan that had crashed during the smuggling event. The vehicle was stored at Frontier Towing in Tucson, Arizona. During the search of the vehicle, a white iPhone "lightning" style charger used to charge

iPhones was plugged into a charging base that was plugged into the center console power outlet. This charger was within arm's reach of the driver's seat.

16.     On May 28, 2021, I went out to the crash scene to attempt to locate the iPhone described by **Ramirez**.  I found a black iPhone cell phone laying in the path of the rolled vehicle as indicated by debris, tire skids, and the apparent path that the vehicle traveled. The phone was severely damaged to the extent that the internal components of the device were exposed, the screen was smashed and had extensive cracks and pieces fragmenting from the screen. A few feet from the phone, I found a clear case for the iPhone in the same path of debris from the wreckage.  Based on the description given by **Ramirez** and the locations that the device and case were located in, I believe that the device and case are the same ones used by **Ramirez** to coordinate and facilitate this smuggling event.

17.     Based on the information discussed above, there is probable cause to believe that the **Target Device #4** contains evidence of alien smuggling activities committed in violation of 8 U.S.C. § 1324.

18.     Based on the condition of **Target Device #4**, I intend to attempt to conduct an extraction of the data contained in the device; however, this may not be possible due to the damage sustained during the collision.  I will also attempt to conduct an extraction of the data on any components of the device that may still be operable, such as SIM cards, mass storage cards, etc., that may be able to produce evidence as to the owner/subscriber of the device and other information pertinent to this investigation.

### TECHNICAL TERMS

19.     Based on my training and experience, the following technical terms are used to convey the following meanings:

a.     <u>Wireless telephone</u>:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.

These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.    <u>Digital camera</u>:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.    <u>Portable media player</u>:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.    <u>GPS</u>: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a

special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.     Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g.     Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        i.     <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20.     Based on my training, experience, and research, I know that these devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, the nature of alien smuggling almost universally necessitates frequent and immediate communication between co-conspirators and accomplices. As such, examining data stored on devices of this type frequently uncover, among other things, evidence that reveals who possessed or used the device, the rank and scope of their participation in the smuggling organization, who their accomplices were, and particular details regarding their criminal conduct.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23.     Because this warrant seeks only permission to examine a device already in

law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

24.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Device #4** described in Attachment A to seek the items described in Attachment B. Having signed this affidavit under oath, I swear that its contents are true and correct to the best of my knowledge, information, and belief.

CHAD L LAKOSKY

Digitally signed by
CHAD L LAKOSKY
Date: 2021.06.02
12:46:50 -07'00'

_____
Chad Lakosky, Special Agent
Homeland Security Investigations

Subscribed and Sworn to telephonically_____**2nd**_____ day of June, 2021.

_____
United States Magistrate Judge

## ATTACHMENT A

This warrant authorizes the forensic examination of **Target Device #4**, including any components of the device that may still be operable and contain evidence, for the purpose of identifying the electronically stored information described in Attachment B. **Target Device #4** is a black Apple iPhone with clear case seized on May 28, 2021.

## ATTACHMENT B

1.      Data and/or digital files stored on or accessed through **Target Device #4** (as described in Attachment A) relating to violations of 8 U.S.C. § 1324, wherever it may be stored or found, specifically including:

      a.   Lists of customers and related identifying information.
      b.   Alien smuggling fees, as well as dates, places, and amounts of specific transactions.
      c.   Types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions.
      d.   All bank records, checks, credit card bills, account information, and other financial records.

2.      Electronic correspondence stored on or accessed through **Target Device #4** relating to alien smuggling, to include emails and attached files, text messages, and instant messaging logs.

3.      Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through **Target Device #4**.

4.      Contact lists stored on or accessed through **Target Device #4**, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5.      The content of voice mail messages stored on **Target Device #4**, along with the date and time each such communication occurred, including voice mail messages sent by texting or instant message applications

6.      Evidence of persons who used, owned, or controlled **Target Device #4**.

7.      Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through **Target Device #4**.

8.      Evidence showing the location of **Target Device #4** from April 22, 2021, through May 22, 2021.

9.      Maps, directions and other evidence showing the route or intended route of travel from April 22, 2021, through May 22, 2021.

10.      Photographs or video recordings.

11.      Information relating to the schedule, whereabouts, or travel of the user of **Target Device #4**.